**Corrected**

# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0496V

| | |
|---|---|
| HOLLY YOUNG,<br><br>                     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                     Respondent. | Chief Special Master Corcoran<br><br>Filed: October 6, 2025 |

*Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA*, for Petitioner.

*Sarah Christina Duncan, U.S. Department of Justice, Washington, DC*, for Respondent.

### RULING ON DAMAGES[1]

On April 23, 2020, Holly Young[2] filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[3] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on October 4, 2017. Petition at 1. After Respondent conceded entitlement, the parties were unable to resolve damages on their own,[4] so I ordered briefing on that matter.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Ms. Young filed this claim using her married name, but reverted to her maiden name after obtaining a divorce. On August 28, 2021, I amended the caption accordingly. ECF No. 34.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[4] Although I authorized the parties to retain economists and life care planners, they were unable to reach an agreement related to the appropriate amount of damages in this case. On January 17, 2023, I ordered additional briefing.

For the reasons set forth below, I find that Petitioner is entitled to a damages award in the amount of **$200,000.00 past pain and suffering, $1,000.00 per year for future pain and suffering – equating to a net present value of $19,330.86. I also find $264,570.00 is the appropriate amount of future lost wages. For expenses, Petitioner is awarded $3,477.07 for past and an amount sufficient to purchase an annuity to cover the future expenses described in this Decision.**

   I.     **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of*

*Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II. Prior SIRVA Compensation Within SPU[5]

### A. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2025, 4,983 SPU SIRVA cases have resolved since the inception of SPU more than ten years before. Compensation has been awarded in the vast majority of cases (4,817), with the remaining 166 cases dismissed.

2,744 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[6] In only 310 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[7] As I have previously

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 2,073 compensated SIRVA cases were resolved via stipulated agreement the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,403 cases) or stipulation (31 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than

stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *310* | *2,403* | *31* | *2,073* |
| **Lowest** | $25,000.00 | $4,000.00 | $37,013.60 | $1,000.00 |
| **1st Quartile** | $67,020.04 | $60,000.00 | $90,000.00 | $30,000.00 |
| **Median** | **$91,290.04** | **$79,444.74** | **$115,772.83** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $106,293.26 | $161,501.20 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 310 SPU SIRVA cases in which damages were determined via reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $25,000.00 to $215,000.00, with $90,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

---

instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in

4

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.   The Parties' Arguments

Petitioner asserts that she is entitled to a past pain and suffering award of $215,000.00; a future pain and suffering award of $34,500.00; $455,189.00 for lost wages; $6,431.01 for past unreimbursed expenses; and an annuity which covers the expenses listed in the life care plan created by her planner, Staci L. Schonbrun, Ph.D.[12] Petitioner's Brief in Support of Damages ("Brief") at 1, 20, 29, ECF No. 64. Although the amount Petitioner seeks for future pain and suffering - based upon annual payments of

---

Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

[12] Dr. Schonbrun fulfilled the dual roles of vocational expert and life care planner for Petitioner. Exs. 31 (vocational expert report), 37-39 (life care plan). In addition to her doctorate degree, Dr. Schonbrun possessed multiple degrees and certifications. Ex. 36 at 1 (curriculum vitae ("CV")).

5

$1,500.00 for a life expectancy of 23 years - has not yet been decreased to a net present value (*id.* at 20), her economist, Robert W. Cook, Ph.D.,[13] reduced the differing amounts proposed for future lost wages using the determinations from his three expert reports. Ex. 25 at 4-7; Ex. 29 at 7-12; Ex. 40 at 7-9; *see* Section 15(f)(4)(A) (requiring "payment of compensation . . . on the basis of the net present value"). Petitioner's life care plan covers expenses such as massage therapy, an adjustable bed, housekeeping, the maintenance of rental properties that Petitioner owns, and transportation to and from medical care. Brief at 26-29; *see* Exs. 38-39. Petitioner also includes $1,000.00 annually to cover her medical insurance deductible until the age of 85. Ex. 38 at 1; Ex. 39 at 1.

The amount of lost wages Petitioner ultimately proposes is based upon Dr. Cook's calculations in his third and final report, provided on May 2, 2023[14] (Brief at 21 - citing Exs. 40-41), as well as the opinion of her vocational expert, Dr. Schonbrun, "that Petitioner's pre-injury wages are most representative of her pre-injury earning capacity . . . [and] Petitioner's present job and actual earnings are the most reasonable representation of her post-injury earning capacity" (Brief at 20-21 - citing Ex. 31). Regarding her current position as an administrative/triage nurse - consisting of 32 hours per week (80 percent employment), Dr. Schonbrun opines that "[i]t is not reasonable to 'grow out' this position to 100% time, since this position does not exist in that capacity." Ex. 31 at 19.

To support the amount she seeks for pain and suffering, Petitioner emphasizes her severe pain levels and "grueling course of treatment over the past five and a half years that surpasses the most severe SIRVA cases in the program." Brief at 15. She stresses that she received from treaters "a permanent partial disability rating of 30%, . . . has endured insomnia, anxiety, depression, and weight gain, . . . [and] will likely never fully recover from this injury." *Id.* at 16-17. Petitioner favorably compares the facts and circumstances in her case to those suffered by the petitioners in *M.W.*, *Schoonover,* and *Meirndorf*[15] - decisions featuring past pain and suffering awards ranging from

---

[13] Dr. Cook's CV was provided with his first expert report. Ex. 26.

[14] In his first expert report, Dr. Cook proposed $300,071.00 for lost wages. Ex. 25 at 7, 14. In his second report, he proposed an additional amount of $182,428.00 for lost per diem income – resulting in a revised total of $482,499.00. Ex. 29 at 13-30 (for specific calculations). After accounting for specific offsets related to Ms. Young's disability and workers' compensation payments, Dr. Cook calculated $272,761.00 for lost wages, plus the same lost per diem amount of $182,428.00 - resulting in the proposed lost wages amount of $455,189.00

[15] *M.W. v. Sec'y of Health & Hum. Servs.,* No. 18-0267V, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021) (awarding $195,000.00 for past pain and suffering); *Schoonover v. Sec'y of Health & Hum. Servs.,* No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for past pain and suffering); *Meirndorf v. Sec'y of Health & Hum. Servs.,* No. 19-1876V, 2022 WL 1055475 (Fed. Cl. Spec. Mstr. Mar. 7, 2022) (awarding $200,000.00 for past pain and suffering).

$195,000.00 to $200,000.00. Brief at 14-15, 17-18. However, she maintains that her injury "had a more profound effect on [her] life than the lives of [those] [p]etitioners." *Id.* at 18.

Respondent counters that Petitioner should be awarded $160,000.00 for past pain and suffering. Respondent's Damages Brief ("Opp.") at 34, ECF No. 65. Insisting that Petitioner's "ongoing symptoms . . . are mild in nature and cause minimal functional impairment," and her "treatment at this point appears limited to infrequent physical therapy of less than one session monthly and two visits annually for her pain medicine physician for refills" (*id.* at 31), Respondent does not propose a future pain and suffering award. He maintains that Petitioner's case is most analogous to *Reed*[16]" – a case also involving a $160,000.00 award.

Additionally, Respondent disputes several of the expenses (both past and future) that Petitioner seeks. Opp. at 14-19, 32-34. For past expenses, he includes only the costs related to Petitioner's PT – including transportation costs paid at IRS medical mileage rates for 2021-23, and the purchased shoulder brace, for a total past expense amount of $741.83. *Id.* at 33-34. Relying upon the life care plan prepared by his planner, Linda J. Curtis, RN,[17] Respondent opposes Petitioner's request for private healthcare deductibles through age 85, any expenses related to acupuncture or massage, the cost of an adjustable bed, housekeeping costs, and expenses related to the rental properties Petitioner owns. *Id.* at 14-19. For health insurance, Respondent "recommends covering [P]etitioner's SIRVA related co-pays, but not her premium,[18] which is a routine expense, until [P]etitioner attains the age of 65 . . . [and] [P]etitioner's Medicare Part B deductible" thereafter. *Id.* at 14-15.

For lost wages, Respondent relies upon reports from his vocational expert, Behnush B. Mortimer, Ph.D.,[19] and his economist, Patrick F. Kennedy, Ph.D.[20] Opp. at 21-29 (citing Exs. A & C). Dr. Mortimer agrees that "Ms. Young has restrictions that do preclude her from her past clinical work as a floor nurse working hands on with patients" but opines that her education and work history in different departments "allow Ms. Young to present as a strong nursing candidate for employment in the labor market with many transferable skills." Ex. A at 14. Furthermore, Dr. Mortimer opines "that Ms.

---

[16] *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

[17] In addition to being a registered nurse, Ms. Curtis is a certified nurse life care planner. Ex. F.

[18] Respondent mistakenly refers to Petitioner's "premium" instead of deductible, but this reference appears to be a simple mistake. Opp. at 14.

[19] Dr. Mortimer's additional degrees and certifications are listed in his CV. Ex. B at 2.

[20] Dr. Kennedy's CV was included at the end of his expert report. *See* Ex. C at 15-30.

7

Young has the capacity to work at a 100% full-time schedule with no additional per diem work," adding that his labor market research revealed "a variety of the types of occupations which Ms. Young qualifies for available both in Iowa City, Cedar Rapids, and remote positions." *Id.* After accounting for Ms. Young's earnings and offsets from disability benefits and her workers' compensation settlement, Dr. Kennedy calculates a total lost wages award of $264,570.00. Ex. C at 13.

In their respective responsive damages briefs, the parties continue to disagree upon the past and future expenses which should be reimbursed, reiterating previously made arguments related to the costs of massage therapy, the adjustable bed, housekeeping, repairs, and the appropriate mileage rates. Petitioner's Reply Brief in Support of Damages ("Pet. Reply") at 1-5, 16-18, ECF No. 69; Respondent's Supplemental Brief Regarding Damages ("Res. Reply") at 1-4, 10-14, ECF No. 68. Regarding the prescription costs she seeks, Petitioner misunderstands the basis of Respondent's objection to her weight loss medication - insisting "the records (as summarized by Respondent) clearly indicate weight gain as a side effect of the Lyrica prescribed to Petitioner by Dr. Walia for her shoulder pain." Pet. Reply at 17 (citing Opp. at 33). But Respondent actually opposes this expense due to a lack of documentation – maintaining that Petitioner has not provided "proof that she actually paid the amount claimed." Opp. at 33. When requesting payment of her future medical insurance costs, Petitioner emphasizes the difficulties calculating "the actual cost and duration of [her] ongoing treatment," adding that "[t]he intent of the Vaccine Program cannot be to make recovery of damages harder for petitioners than if they were in normal civil courts." Pet. Reply at 5.

Regarding Petitioner's lost wages, the parties disagree on her future earnings potential. Pet. Reply at 5-6; Res. Reply at 4-5. Petitioner disputes the job search results from Dr. Mortimer, stating that she "underwent a real life job search and obtained employment that met her physical limitations." Pet. Reply at 8. Additionally, Respondent argues that Petitioner's past earnings should be based on a three-year average, rather than only the year prior to her SIRVA as Petitioner contends. Res. Reply at 6; Pet. Rely at 9-10. He also insists Petitioner should not be paid interest on her past award and stresses that offsets related to Petitioner's disability and retirement benefits should be considered when calculating her past earnings. Res. Reply at 5-6. In response, Petitioner notes that Dr. Cook accounted for the disability and retirement benefits offsets in his third and final report. Pet. Reply at 11.

Finally, the parties continue to disagree on the extent and severity of Petitioner's pain and suffering. Pet. Reply at 12-16; Res. Reply at 7-10. Characterizing her case as similar to those involving two surgeries and disputing Respondent's assessment of her ongoing symptoms as mild, Petitioner criticizes Respondent's comparison of her facts

and circumstances to those suffered by the *Reed* petitioner - insisting that the *Reed* petitioner's treatment amount and duration could be doubled and would still fall short. Pet. Reply at 12-16. In contrast, Respondent insists "the placement of a nerve stimulation is not comparable to an orthopedic surgery" as it did not require general anesthesia or pain medication. Res. Reply at 8. Stressing that Petitioner's ongoing treatment is limited and her impairment rating is lower than the cases involving future awards that she cites (*id.* at 9), Respondent insists that "[P]etitioner has not produced evidence justifying an award for future pain and suffering" (*id.* at 10).

## IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the filed medical records, affidavits, and sworn declarations and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Ms. Young suffered a particularly severe SIRVA injury, requiring arthroscopic surgery on August 7, 2018 (approximately ten months post-vaccination),[21] and significant PT thereafter that provided only limited relief.[22] During the subsequent year, Petitioner pursued treatment from a pain

---

[21] When Petitioner first sought treatment for her injury, she reported sharp pain, accompanied by numbness and tingling down her arm. Ex. 4 at 33. Although her pain level then improved slightly, from nine to six out, her decreased mobility continued. *Id.* Following 20 PT sessions attended from November 13, 2017, through March 28, 2018, she was assessed as having a pain rating that were not improving and failing to meet any PT goals. Ex. 5 at 397.

On August 7, 2018, Petitioner underwent a left shoulder arthroscopic surgery which included an anterior capsular and rotator interval release, capsular release, subacromial decompression, biceps tenotomy, and extensive debridement. Ex. 6 at 163-66. During a follow-up call the next day, Petitioner reported doing well with pain reasonably controlled by prescribed medication, but some numbness in her ring and pinky fingers after the temporary nerve block performed prior to surgery wore off. *Id.* at 166.

[22] Petitioner made only slight progress during PT sessions in August through December 2018. *Compare* Ex. 6 at 619-20 (showing significant deficiencies performing functional tasks in August) *with id.* at 789, 1073, 1356 (showing only slight improvement in September and the same difficulties thereafter). Throughout her PT sessions, Petitioner continued to complain of severe pain, limited movement, difficulties sleeping – including the need to sleep in her recliner on multiple occasions, and concerns about potential weight gain from her medication and lack of activity. *Id.* at 625, 628, 631, 641, 668, 708, 768, 777, 901, 982, 1004, 1092, 1255.

management specialist who administered nerve blocks on March 1 and May 29, 2019 (providing only temporary relief),[23] and then more lastly and significant relief from the implantation of a nerve stimulator on August 20, 2019.[24] During this time, Petitioner also continued to attend PT, began seeing a psychotherapist, and reported good benefits from massage therapy.[25] By October 2019 (now approximately two years post-vaccination), Petitioner reported relief with the activation of the nerve stimulator and in response to the prescribed Lyrica, but unfortunate side effects such as weight gain.[26]

Even though they involve petitioners who underwent *two* arthroscopic surgeries, the SIRVA cases proposed by Petitioner offer the best comparisons to Petitioner's facts and circumstances. Petitioner's one surgery, temporary nerve blocks, and a nerve stimulation implant may not equate to multiple arthroscopic surgeries, but the overall duration of her injury was greater. Furthermore, she did not obtain significant pain relief until implantation of the nerve stimulation device in August 2019, more than 22 months post-vaccination. And as described in detail in her two supplemental declarations, Petitioner's injury has affected multiple facets of her life, both professionally and

---

[23] On January 3, 2019, more than two years post-vaccination, Petitioner was referred to a pain management specialist by her occupational health physician. Ex. 9 at 96-97. At the initial appointment on February 19, 2019, the pain management specialist observed that Petitioner had some improvement in her ROM after surgery but continued to experience pain that was aching, constant, and "radiating along the left side shoulder with pulsating discomfort along the bicep and lateral aspect of [her] left arm down to 4th and 5th fingers." Ex. 6 at 251. Providing an estimated pain level of seven out of ten, Petitioner reported that her pain often interfered with her ability to sleep. *Id.* at 252-53.

At the next appointment on March 1, 2019, the pain management specialist assessed Petitioner as not meeting the criteria for complex regional pain syndrome, having a clinical presentation suggestive of neuropathic pain, and showing evidence of degenerative changes in her cervical spine. Ex. 6 at 281. He administered a mononeuropathy-left scapular nerve block. *Id.* at 284. Immediately thereafter, Petitioner reported her pain had decreased from five to four. *Id.* At her next appointment, she described a pain reduction to three out of ten and improved mobility and functionality for approximately five weeks, followed by a return almost to pre-procedure levels. *Id.* at 300-01. She underwent a second nerve block on May 29, 2019, which again provided some temporary relief. *Id.* at 366.

[24] After experiencing some difficulties associated with previously prescribed pain medication, Petitioner started taking Lyrica on May 21, 2019. Ex. 6 at 342. On August 20, 2019, she received a nerve stimulator implant. *Id.* at 460-61. One week later, Petitioner reported that her pain improved from seven to two when her implant was active, and she was "very grateful for this implant . . . that . . . has helped her pain so much [she] is able to function much greater in her day-to-day life." *Id.* at 479-80.

[25] During visits with her pain management specialist, Petitioner reported benefits from PT and massage therapy. Ex. 6 at 515, 524, 533, 542. She attended 59 PT sessions, involving treatment described as therapeutic procedure, manual therapy techniques, and neuromuscular reeducation, from March 2019 through May 2020. Ex. 17. On June 12, 2019, she began seeing a psychotherapist. Ex. 15 at 3-5.

[26] In September and October 2019, Petitioner continued to reported improvement in pain and ROM from the implant and Lyrica, but a concern with weight gain attributed to the prescribed Lyrica. *Id.* 493, 501-02, 515.

personally.[27]

Additionally, *Garcia* and *Tappendorf*[28] - cases involving arthroscopic surgery, plus additional less invasive procedures (Tenex and two manipulations respectively) - are instructive. Although the *Garcia* and *Tappendorf* petitioners suffered SIRVAs with a shorter documented duration (approximately two years) and unrelated conditions to which some of their symptoms could be attributed, they were awarded $190,000.00 and $185,000.00, respectively for past pain and suffering.[29]

In contrast, the *Reed* case cited by Respondent involved a SIRVA injury that was clearly less severe. That claimant suffered greater pain levels for only the initial six months of her injury, until gaining significant relief following one arthroscopic surgery. *Reed,* 2019 WL 1222925, at *15-16. Although the overall duration of her injury was several years, the *Reed* petitioner's initial period of more intense pain was one-fourth of that suffered by Petitioner. *Id.*

Furthermore, Petitioner has a documented permanent disability rating of either 20 or 30 percent, plus ongoing (albeit milder) symptoms[30] that justify a projected pain and suffering award, but at a lower amount than that requested - $1,000.00 per year. This sum will also be reduced to net present value, utilizing a discount rate of 1.5 percent, as I have recently found to be appropriate.[31] Based upon a life expectancy of 84.5 years, the

---

[27] These two declarations are signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exs. 27, 43. In the documents, Petitioner recounts the difficulties she encountered, including the end of her marriage, limitations related to her employment, activities during family vacations, and interactions with her grandchildren. *Id.*

[28] *Garcia v. Sec'y of Health & Hum. Servs.,* No. 19-1529V, 2025 WL 1159016 (Fed. Cl. Spec. Mstr. Mar. 21, 2025); *Tappendorf v. Sec'y of Health & Hum. Servs.,* No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb. 23, 2024).

[29] As her own expert acknowledged, the *Garcia* petitioner simultaneously suffered from rheumatoid arthritis and a superior labrum anterior-posterior or SLAP tear. *Garcia,* 2025 WL 1159016, at *8. And the *Tappendorf* petitioner's SIRVA symptoms lasted approximately two years with later symptoms, following a significant gap in treatment, found not to be vaccine-related. *Tappendorf,* 2024 WL 1299566, at *4.

[30] On April 6 and 14, 2020, Petitioner underwent independent medical evaluations which documented her ongoing symptoms. Exs. 18-19. She was assess as having a 30 percent and 20 percent disability, respectively. Ex. 18 at 7; Ex 19 at 14.

[31] In a case I decided in February 2024, in which Dr. Kennedy also opined, I found his reasoning for proposing a 1.5 percent discount rate to be sound. *Joyce,* 2024 WL 1235409, at *3. Thus, I will apply that discount rate in this case when determining the net present value of Petitioner's future pain and suffering award.

resulting amount would be $19,330.86.[32]

### V. Appropriate Compensation for Petitioner's Lost Wages

The parties agree that Petitioner's SIRVA prevents her from performing the duties of a registered nurse engaging in direct patient care, for example as a floor nurse. Ex. 31 at 18 (Dr. Schonbrun's expert report); Ex. A at 14 (Dr. Mortimer's expert report). Prior to her injury, Petitioner worked two twelve-hour shifts on Saturday and Sunday as an emergency room shift supervisor for which she was provided full-time pay at Mercy Hospital in Cedar Rapids, Iowa, approximately 78 minutes from her hometown.[33] Ex. 31 at 11. She was able to supplement her income by working lucrative, albeit temporary, contract positions as a travel nurse or extra hours at her primary job. Ex. 31 at 11-12; Ex. A at 8.

After the injury, Petitioner was placed in an alternate position (monitor tech and assistant in the volunteer office) at Mercy Hospital following her return to work, but this position was eliminated in May 2019, due to reasons unrelated to her injury or performance. Ex. 31 at 12; Ex. A at 8. Fortunately, Petitioner was able to obtain employment at the Admission Transfer Center at the University of Iowa Hospital in Iowa City, resulting in eleven more minutes of drive time (from 78 to 89 minutes).[34] Ex. 31 at 12; Ex. A at 14. "Her job is to "facilitate transfers from outside hospitals, internal triage, bed planning, and patient follow-up." Ex. 31 at 12. Although she now works two twelve-hour shifts and one eight-hour shift per week (32 hours total), her position is considered part-time (80 percent) employment. Ex. 31 at 12; Ex. A at 14.

Petitioner insists that she is unable to obtain additional income because her job will never be increased to full-time. Ex. 31 at 15, 18. When making this assertion, Petitioner (via Dr. Schonbrun) stresses her lengthy commute (*id.* at 18-19), but she had a similarly long drive time at her previous job as well. And her schedule of three days of work for 32 hours per week should allow for some additional employment, even if not within the same position. Although Petitioner is unable to supplement her income in the manner she previously did, she has failed to establish she is unable to supplement her income by *other* forms of employment which she could perform. Dr. Mortimer's job search

---

[32] This result is obtained using the net present values ("NPV") function in excel. Petitioner's life expectancy was obtained from the Social Security Administration's website. *See* https://www.ssa.gov/cgi-bin/longevity.cgi (last visited on Sept. 3, 2025).

[33] This driving time was obtained using Mapquest.com and entries for Cedar Rapids and Dubuque, Iowa. www.Mapquest.com (last visited Sept. 7, 2025).

[34] This driving time also was obtained using Mapquest.com and entries for Iowa City and Dubuque, Iowa. www.Mapquest.com (last visited Sept. 7, 2025).

resulted in numerous positions available to Petitioner considering her expertise and experience, which I agree is significant. Ex. A at 14-15. Furthermore, Dr. Mortimer still allows for a substantial future lost wages component, but one that is based on an accurate reflection of Petitioner's current job as being part-time, 80 percent of a normal 40-hour work week.

Additionally, Respondent's method of calculating Petitioner's past earnings based on a three-year average is commonly used in the Vaccine Program. Limiting this calculation to only one year is less reliable, especially as in Petitioner's case when much of her earnings are dependent on contracts for temporary employment. For example, Petitioner's 2015 income outpaced her 2016 income, showing she was not guaranteed a steady rise in income. Ex. C at 2 (Dr. Kennedy's expert report). And there is nothing in the record to suggest Petitioner would be able to repeat the significant gains she was able to procure the year prior to her SIRVA (2017), which appears to have been based on a particularly lucrative contract position (even if temporary).

Petitioner's request for inclusion of pre-Judgment interest seeks something not appropriate for Vaccine Program awards. She did, however, include offsets for prior disability and retirement benefit payments in her request. Still, due to these calculation differences, as well as the more accurate portrayal of Petitioner's future employment possibilities provided by Respondent, I find the amounts Respondent proposes to be more accurate. Petitioner is entitled to a net present value of $264,570.00 for her future lost wages.

## VI.   Compensation for Petitioner's Unreimbursed Expenses

Petitioner has failed to provide the evidence needed to establish that costs related to massage or acupuncture are reasonably necessary to treat her SIRVA symptoms. Petitioner initiated these treatments on her own, despite the fact that she had been encouraged to continue the massage therapy. She was not instructed to pursue these treatments by any of her treating physicians. And the cursory letter from Melissa Carey, PA-C, who first treated Petitioner in November 2021, more than four years post-vaccination and over 18 months after this claim was filed, is not sufficient to establish the reasonableness of this expense. Ex. 35; *see* Ex. 33 (showing only one visit to PA Carey on November 5, 2021).

Additionally, the massages received by Petitioner to date are 60 to 90-minute full body massages. *See,* e.g., Ex. 44 at 8-9. There is no evidence that they are focused on her left shoulder. And there is a dearth of information regarding the acupuncture that Petitioner believes would be helpful. Furthermore, the costs of Petitioner's PT – treatment focused specifically on her SIRVA symptoms - are being fully reimbursed. Accordingly,

such costs are not properly allowed.

Petitioner will, however, be reimbursed for the remainder of the past expenses requested. Exs. 45-46. Petitioner has provided adequate documentation of costs associated with the shoulder brace and prescription drugs. Ex. 44 at 18-20, 37, 43-44, 50; Ex. 45 at 1. And the medical records show Petitioner's weight gain to be linked directly to the Lyrica medication needed to combat her continued left shoulder pain. And although the documentation regarding the deductibles paid to Petitioner's psychotherapist is questionable, I also will allow these costs, totaling $500.00. Ex. 44 at 4-7; Ex. 45 at 1. I have also consistently found the IRS business rate to be appropriate when calculating transportation costs.[35]

The elimination of all costs related to massage therapy and acupuncture results in a reduction of past medical expenses – from $3,772.38 to $1,076.86, and total mileage (from 4,059 to 2,515 miles). Exs. 45-46. Calculations based upon the IRS business rates for 2020 to 2023, result in $1,500.21 in past transportation costs.[36] Additionally, I will add $900.00 to Petitioner's past expenses to account for PT deductibles likely paid between the briefing in this case and my final damages decision. Thus, the total for Petitioner's past unreimbursed expenses is $3,477.07.

Regarding future expenses, the parties agree Petitioner will continue to require PT, as well as visits to the psychotherapist and pain management specialist, but they disagree upon the frequency of this treatment. *Compare* Ex. 38 at 10-11 *with* Ex. D at 3-4, 7. They also agree on the need for the purchase of jar openers, bathroom grab bars, a handheld shower head, a bathroom chair, a shoulder ice sleeve, and over the counter Tylenol, but they disagree on the cost and/or need for replacement related to all but the jar openers. *Compare* Ex. 38 at 4-6 *with* Ex. D. at 5-6.

---

[35] *See Evans v. Sec'y of Health & Hum. Servs.,* No. 22-1225V, 2025 WL 2303787, at *11 (Fed. Cl. Spec. Mstr. July 7, 2025); *Chalgren v. Sec'y of Health & Hum. Servs.,* No. 22-0245V, 2025 WL 1649633, at *13 (Fed. Cl. Spec. Mstr. May 5, 2025); *Hartz v. Sec'y of Health & Hum. Servs.,* No. 22-0596V, 2024 WL 4546275, at *1 (Fed. Cl. Spec. Mstr. Sept. 20, 2024); *J.S. v. Sec'y of Health & Hum. Servs.,* No. 22-0879V, 2024 WL 3326833, at *8 (Fed. Cl. Spec. Mstr. Apr. 29, 2024); *Kahler v. Sec'y of Health & Hum. Servs.,* No. 19-1938V, 2024 WL 1928451, at *16 (Fed. Cl. Spec. Mstr. Mar. 27, 2024); *Walters v. Sec'y of Health & Hum. Servs.,* No. 21-1461V, 2024 WL 1299576, at *5 (Fed. Cl. Spec. Mstr. Feb. 27, 2024); *Tappendorf v. Sec'y of Health & Hum. Servs.,* No. 20-1592V, 2024 WL 1299566, at *6 (Fed. Cl. Spec. Mstr. Feb. 23, 2024); *Kleinschmidt v. Sec'y of Health & Hum. Servs.*, No. 20-0680V, 2023 WL 9119039, at *7 (Fed. Cl. Spec. Mstr. Dec. 5, 2023); *Gibson v. Sec'y of Health & Hum. Servs.*, No. 20-0243V, 2022 WL 17820891, at *12 (Fed. Cl. Spec. Mstr. Oct. 5, 2022).

[36] This total is calculated as follows: 52 miles x $0.575 + 739 miles x $0.56 + 723 miles x $0.585 + 715 miles x $0.625 + 286 x $0.655 = $1,500.21. The business mileage rates from 2020 to 2023 can be found on the IRS website. https://www.irs.gov/tax-professionals/standard-mileage-rates (last visited Sept. 12, 2025).

In accordance with the Vaccine Act's aim of generously compensating those petitioners shown to be vaccine injured, sufficient payment will be allocated to purchase the agreed-upon items at the maximum cost and frequency requested by Petitioner. This equates to the following purchases: 1. bathroom grab bars ($200.00); 2. handheld shower head ($110.00), replaced every ten years; 3. bathroom chair ($160.00), replaced every two years; 4. shoulder ice sleeve ($41.72), replaced every year; and 5. bottle of Tylenol ($11.99), everyone month. *See* Ex. 38 at 4-6. Additionally, $25.00 co-pays through 2027 (age 64), Medicare Part B coinsurance of 20 percent per year beginning in 2028 (age 65) and continuing for life,[37] and accompanying transportation costs calculated using the IRS business rate for life will be allowed for the following treatment: 1. twice monthly PT sessions; 2. monthly psychotherapy visits; and 3. twice yearly visits with a pain management specialist. *See* Ex. 38 at 2, 10. The parties agree that the Medicare Part B coinsurance of 20 percent per year beginning in 2028 and continuing for life is as follows: 1. $720.00 for PT; 2. $432.00 for psychotherapy; and 3. $90.00 for pain management.

Besides the already addressed issues of massage and acupuncture costs and the mileage to use when calculating transportation costs, the parties disagree upon all remaining items on their respective life care plans.[38] Of these disputed expenses, I will allow the cost of the adjustable bed. When warranted, I have previously allowed such accommodations. *See,* e.g., *Dylla v. Sec'y of Health & Hum. Servs.,* No. 21-2310V, 2024 WL 1435504, at *4 (Fed. Cl. Spec. Mstr. Feb. 27, 2024) (approving the cost of a walk-in shower). Given the documented difficulties Petitioner has encountered sleeping, I find this expense to be reasonably necessary.

I do not, however, find the expenses related to housekeeping and the maintenance and repair of the rental properties Petitioner owns to be reasonably necessary to manage her injury. In this case, the record does not show Petitioner will be unable to perform these housekeeping tasks. And it is usual for rental property owners to pay maintenance costs out of the generated income.

Expenses such as heavy housekeeping and twice-a-year yard maintenance have been compensated when a petitioner has suffered a significant vaccine-related injury (such as Guillain-Barré syndrome resulting in intractable, life-long deficits) shown to impact the petitioner's ability to perform these tasks. *See Hoisington v. Sec'y of Health &*

---

[37] As discussed later in this Decision, I am not awarding Petitioner the requested overall medical insurance costs. Thus, I am awarding these amounts for the described future medical care.

[38] A comparison of the parties' life care plans reveals the disputed areas. *Compare* Exs. 38-39 *with* Exs. D. Although Respondent failed to address two weeks of home health care related to the implanted nerve stimulator, as well as supplies, maintenance, and follow-up with no additional cost, that Petitioner seeks (Ex. 38 at 14; Ex. 39 at 3) in his plan (Ex. D), his life care planner objected to the reimbursement of this expense in her accompanying narrative (Ex. E at 3).

15

*Hum. Servs.,* No. 19-1043V, 2024 WL 3913712, at *16-17 (Fed. Cl. Spec. Mstr. July 22, 2024); *Spayde v. Sec'y of Health & Hum. Servs.,* No. 16-1499V, 2023 WL 6806125, at *14 (Fed. Cl. Spec. Mstr. Sept. 21, 2023). But they also have been denied when sufficient evidence to substantiate such expenses has not been provided. *See Goldman v. Sec'y of Health & Hum. Servs.,* No. 16-1523V, 2020 WL 6955394, at *11 (Fed. Cl. Spec. Mstr. Nov. 2, 2020). As previously noted by another special master, what is reasonably necessary should be "construe[d] . . . to mean that an award should provide compensation beyond that which is required to meet the basic needs of the injured person in the compensable areas but short of that which may be required to optimize the injured person's quality of life." *Scheinfield v. Sec'y of Health & Hum. Servs.,* No. 90-0212V, 1991 WL 94360, at *2 (Fed. Cl. Spec. Mstr. May 20, 1991). It should lie "lie[] somewhere between that which is 'indispensable' and that which is 'advantageous.'" *Id.* That showing has not been made in this case for this category of expense.

Similarly, Petitioner has not provided sufficient evidence to support her claim for two weeks of home health care related to the maintenance of her implanted nerve stimulator. She has failed to establish that this care likely will be needed. There is no evidence showing such care was required following the initial implantation, or that the cost of such treatment would not be covered by her medical insurance. This expense is simply too speculative.

Finally, Petitioner requests $1,000.00 annually to pay the deductible for medical insurance through life. Ex. 38 at 1; Ex. 39 at 1. But this proposal fails to account for Petitioner's eligibility for Medicare coverage upon reaching the age of 65. And Petitioner's most significant co-pays or Medicare Part B coinsurance for all PT, psychotherapy, and pain management have been awarded in this Decision.

The overall costs of medical insurance have been paid in vaccine cases where "insurance can help cover those medical risks for which compensation would otherwise be allowable under the Act and where the insurance is, in fact, a lower-cost alternative to the funding of those risks." *Huber v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 255, 257 (1991) (finding the reimbursement of future medical insurance premiums was warranted as a lower cost option). Even though Petitioner is requesting only a yearly amount for her deductible, I find payment of this expense is not warranted. And Respondent's proposed method of paying Petitioner only her Medicare Part B annual deductible, but not premiums for her Medicare Part B or Medicare Part D, has been approved in other cases. *See,* e.g., *Goldman,* 2020 WL 6955394, at *10. I will adopt this same approach in this case.

## Conclusion

Based on my consideration of the complete record as a whole and for reasons set forth in this ruling, I find that **$200,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering. For her projected pain and suffering, I find that an award of $1,000.00 per year for life is a fair and appropriate amount of compensation - reduced to its net present value of $19,330.86. I also find that Petitioner is entitled to $264,570.00 for projected lost wages, $3,477.07 for actual expenses, and an amount sufficient to purchase an annuity to cover the expenses included in the life care plan as described in this Decision.**

**The parties shall file a joint status report updating me on their efforts to finalize the award in this case by no later than <u>Thursday, November 06, 2025</u>. In the status report, they should estimate the amount of additional time needed to fully resolve the issue of damages.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master